# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG HANCOCK, | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 07-5042 |
| SLEEPY'S, LLC, | |
| Defendant. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**          FEBRUARY /0 , 2009

Presently before the Court is a Motion for Summary Judgment filed by Defendant Sleepy's, LLC ("Sleepy's"). For the reasons set forth below, the Motion will be denied.

## I. FACTS

Sleepy's is a mattress and bedding retailer with more than 2,500 employees and more than 600 stores, called "showrooms." (Def.'s Mem. Supp. Mot. Summ. J. at 1.) It staffs its showrooms with salespeople who are paid on a commission basis. (Id.) The duties of salespeople include greeting and engaging customers, writing orders and maintaining the showroom. (Id.)

From August 2004 to September 2006, Plaintiff Craig Hancock ("Hancock"), an African American, was employed with Sleepy's as a salesperson. Hancock claims that he had worked in sales for "some twenty years or more" prior to his employment with Sleepy's. (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 14.) Hancock was mainly scheduled to work at the showroom located at 3664 Aramingo Avenue, Philadelphia, Pennsylvania ("the Aramingo showroom"),

approximately two miles from Hancock's home. Hancock was also occasionally assigned to other showrooms in the Philadelphia area. Hancock contends that the Aramingo showroom "had the lowest sales projections in [Hancock's] District" and "was used to punish salesperson's [sic] for disciplinary infractions." (Id. at 3.)

Throughout his employment, Hancock contends that he made "around twenty" requests to be assigned to other stores on a long-term basis. (Id. at 20.) These requests were denied. Hancock alleges that, after working at Sleepy's for approximately five months, he asked one of Sleepy's managers, Michael Grinnan ("Grinnan"), whether keeping him at the Aramingo showroom was a "black thing." (Id. at 5.) According to Hancock, Grinnan's response was "it is what it is." (Id.) Hancock alleges that Grinnan told him that he would not transfer Hancock because Grinnan had hired too many salespeople. (Id.) Hancock claims that Grinnan chose lesser qualified and lesser experienced salesmen, some of whom were Caucasian, over Hancock for better store assignments. (Id. at 5-6.) Hancock further asserts that the Aramingo showroom "had only been staffed by African Americans, as their permanent or long term assignment, as far as records went back." (Id. at 15.)

During the course of Hancock's employment, Sleepy's disciplined Hancock on numerous occasions by issuing him written warnings, or "write-ups." Sleepy's contends that the write-ups were the result of Hancock failing to follow Sleepy's policies and meet sales expectations.[1] (Def.'s Mem. Supp. Mot. Summ. J. at 1-2.) Hancock, however, argues that Sleepy's wrote him

---

[1] According to Sleepy's, Hancock received write-ups for the following reasons: (1) repeatedly arriving to work late or leaving early; (2) failing to deposit showroom money on the day it was received in violation of company policy; (3) wearing hoop earrings on the sales floor in front of customers; (4) failing to follow Sleepy's policy of having customers sign invoices for their purchases; and (5) poor sales performance. (Def.'s Mem. Supp. Mot. Summ. J. at 2.)

2

up to harass and retaliate against him for complaining about his assignment to the Aramingo showroom. (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 4.) Hancock also submits that he was written up for conduct which Grinnan arbitrarily excused for Caucasian employees. (Id. at 4-5.)

On June 28, 2006, Sleepy's demoted Hancock to the position of sales assistant. (Def.'s Mem. Supp. Mot. Summ. J. at 3.) Grinnan testified in his deposition that, when he discussed demoting Hancock with other managers, "[t]he specific issue was around Mr. Hancock's inability to make deposits on time." (Grinnan Dep. 67:15-16, Oct. 29, 2008.) However, Sleepy's Human Resources Manager, Windsor Marchesi ("Marchesi"), stated in his affidavit that Hancock "was demoted due to his consistent inability to follow procedures regarding customer invoices and in making timely bank deposits, and for continued difficulties getting to work on time, and for poor sales performance." (Marchesi Aff. ¶ 12.) Hancock asserts that, in the context of demoting him, he heard Grinnan on his cell phone telling one of Sleepy's managers, Mohammed Abuhillo ("Abuhillo"), " I told you I was going to teach the boy a lesson." (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 6.) Also in June 2006, Hancock complained of "favoritism" that Abuhillo was showing towards Abuhillo's cousin. (Def.'s Mem. Supp. Mot. Summ. J. at 3.) Sleepy's investigated the complaint and found no basis for it. (Id.)

Hancock also alleges that he was harassed in the following ways: (1) Grinnan "watched Plaintiff like he was under a microscope while conversely using a much more lax method of supervision for similarly situated Caucasian personnel" (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 5); (2) "the regional manager smiled when [Hancock] accused him of setting him up for unwarranted discipline for allegedly not having invoices signed" (id.); (3) "Grinnan refused to

3

write Hancock's performance evaluations as required by Sleepy's policies" (id. at 9); (4) Hancock was withheld a night deposit key, thus requiring Hancock to seek out a manager to obtain the key (id.); (5) Hancock "was given a disciplinary write up for not making sales projections, despite the fact that the disciplinary form is not usually used for sales performance" (id.); (6) Abuhillo told Hancock to pick gum out of a showroom carpet or else "go home" (id. at 9-10); (7) a Caucasian employee would continually racially harass Hancock, and Grinnan was on notice of such conduct but failed to discipline the employee (id. at 10); and (8) several of Sleepy's salespeople told Hancock that they had viewed an e-mail by Sleepy's CEO which stated that blacks were not suitable for executive positions in the corporation because "they steal" (id.).

On July 6, 2006, Hancock filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("the Commission"). (Def.'s Mem. Supp. Mot. Summ. J. at 3.) The Commission later issued a finding of no probable cause. (Id.)

On September 24, 2006, Hancock left work and never returned. (Id. at 4.) After not hearing from Hancock over the next few days that he was scheduled to work, Sleepy's claims it made several efforts to contact Hancock to determine whether he intended to return. (Id.) Getting no response, Sleepy's concluded Hancock had resigned his employment. (Id.) The Pennsylvania Unemployment Compensation Board of Review agreed and determined that Hancock had abandoned his job. (Id.)

On November 30, 2007, Hancock filed a Complaint in this Court setting forth eight counts. Count I alleges race discrimination and disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 29 U.S.C. § 2000(e) et seq. ("Title VII"). Count II alleges national origin discrimination and disparate treatment in violation of 42 U.S.C. § 1981 ("Section 1981").

4

Count III alleges race discrimination and disparate treatment in violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("the PHRA"). Count IV alleges race discrimination and hostile work environment in violation of Title VII. Count V alleges race discrimination and hostile work environment in violation of Section 1981. Count VI alleges constructive discharge in violation of Title VII. Count VII alleges constructive discharge in violation of Section 1981. Finally, Count VIII alleges retaliation in violation of Section 1981.

## II.   STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson, 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather, that party must go beyond the pleadings and present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a

summary judgment motion. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325). Further, the non-moving party has the burden of producing evidence to establish prima facie each element of its claim. Celotex, 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

### III. DISCUSSION

#### 1. National Origin Discrimination and Disparate Treatment under Section 1981

In the heading of Count II of the Complaint, Hancock alleges that he was discriminated against on the basis of his national origin in violation of Section 1981. In the body of Count II, however, Hancock does not allege discrimination on the basis of national origin, but rather, alleges that "Plaintiff was subjected to intentional discriminatory and disparate treatment based on his race . . . ." (Pl.'s Compl. ¶ 30.)

The words "national origin" do not appear in Section 1981. Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991) ("Section 1981 does not mention national origin."). Although the Third Circuit has not directly addressed the issue of whether Section 1981 prohibits discrimination on the basis of national origin, the court in Beaubrun v. Inter Cultural Family found that "[t]he majority of district court decisions in this Circuit . . . have rejected the proposition that national origin discrimination claims fall within the statute's ambit." No. 05-6688, 2006 U.S. Dist. LEXIS 47973, at *13 (E.D. Pa. July 14, 2006) (citing Fekade v. Lincoln Univ., 167 F. Supp. 2d 731, 739 (E.D. Pa. 2001) (agreeing with plaintiff's concession that Section 1981 "was not drafted in terms of national origin, and thus [plaintiff's] claim of national

6

origin discrimination cannot be founded on a violation of this statute"); Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 618 (E.D. Pa. 1998) ("Section 1981 . . . does not bar discrimination purely on the basis of national origin.") (citations omitted); King v. Twp. of E. Lampeter, 17 F. Supp. 2d 394, 417 (E.D. Pa. 1998) ("The scope of [Section] 1981 is not so broad as to include disparity in treatment on the basis of religion, sex, or national origin.") (citation omitted); Zezulewicz v. Port Auth. of Allegheny County, 290 F. Supp. 2d 583, 598 (W.D. Pa. 2003) (noting that Section 1981's "scope is limited to instances of racial discrimination"); Wallace v. Graphic Mgmt. Assocs., Inc., No. 04-0819, 2005 U.S. Dist. LEXIS 3298, at *9 (E.D. Pa. Mar. 3, 2005) ("[Section] 1981 does not prohibit discrimination based on national origin . . . .")). However, Beabrun also recognized that the court in Abdulhay v. Bethlehem Med. Arts, L.P. found that "[d]iscrimination on the basis of national origin, ethnicity and ancestry clearly fall within the realm of Section 1981 claims." No. 03-4347, 2004 U.S. Dist. LEXIS 5494, at *17 n.5 (E.D. Pa. Mar. 29, 2004) (citing St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987) ("Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.").

The substantive portion of Count II alleges discrimination on the basis of race, rather than national origin. Therefore, this Court shall treat Count II as an allegation of race discrimination in violation of Section 1981, notwithstanding the language in the heading, and evaluate Count II as such in the analysis which follows.

2.  **Race Discrimination and Disparate Treatment under Title VII, Section 1981 and the PHRA**

Hancock asserts claims of unlawful disparate treatment based on his race under Title VII, Section 1981 and the PHRA. The legal elements and burdens of proof for alleged violations of Title VII and Section 1981 are identical. Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (stating "actions brought under § 1981 . . . require the same elements of proof as a Title VII action"). Similarly, the Title VII analysis generally applies in PHRA cases as well. Woodson v. Scott Paper Co., 109 F.3d 913, 936 n.20 (3d Cir. 1997) ("Title VII standards generally apply in PHRA cases."); Dici v. Pa., 91 F.3d 542, 552 (3d Cir. 1996) ("Generally, the PHRA is applied in accordance with Title VII."). Accordingly, Hancock's claims of disparate treatment under Title VII, Section 1981 and the PHRA will be addressed jointly in this section.

We analyze Hancock's race discrimination and disparate treatment claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, to establish a prima facie case of race discrimination, a plaintiff needs to show that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he had an adverse action taken against him; and (4) similarly situated individuals who were not members of the plaintiff's protected class were treated more favorably. See id. at 802; see also Kimble v. Morgan Props., 241 Fed. Appx. 895, 897-98 (3d Cir. 2007); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). Next, if a plaintiff successfully establishes a prima facie case, the burden of production of evidence shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. See McDonnell Douglas, 411 U.S. at 802; see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997); Fuentes v.

8

Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Finally, if the defendant meets this requirement, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's articulated reason for the adverse employment action is a pretext for a racially discriminatory motive, i.e., plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions." Fuentes, 32 F.3d at 764.

Courts determine a plaintiff's qualifications for purposes of proving a prima facie case by looking only at objective criteria, such as education and experience. See, e.g., Red v. Potter, 211 Fed. Appx. 82, 84 (3d Cir. 2006); Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . . [a] tangible employment action in most cases inflicts direct economic harm." Burlington Indus. v. Ellerth, 524 U.S. 742, 761-62 (1998).

Here, Hancock is an African American, and thus, is a member of a protected class. Hancock was also qualified for his position, for purposes of his prima facie case, "by virtue of having some twenty years or more of sales experience." (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 14.) Further, the demotion of Hancock constituted a significant change in Hancock's employment status resulting in direct economic harm to Hancock; therefore, the third element in Hancock's prima facie case is satisfied.

9

With respect to the final element, Hancock argues that he was denied a transfer, written up and demoted for conduct that was excused for similarly situated individuals who were not members of Hancock's protected class. Hancock testified that he knew he was more qualified than a Caucasian employee who was assigned to a high-volume showroom out of training because he "worked with [him] ten hours a day and . . . [he] talk[ed] about job experience." (Pl.'s Dep., V2, 103:8-10, Oct. 29, 2008.) At Grinnan's deposition, Hancock's counsel asked Grinnan if he was aware that there were salespersons other than Hancock who "committed offenses such as not opening the store on time, and closing the store early, at least on singular occasions, for which you did not write them up," and Grinnan replied "yes." (Grinnan Dep. 86:20-87:2, Oct. 29, 2008.) Grinnan also testified that he never wrote up a salesperson for making racial jokes, although he often observed salespeople engaging in such conduct. (Id. at 77:21-80:19.) Construing all reasonable inferences in favor of the non-moving party, this evidence is sufficient to show that some similarly situated individuals who were not members of Hancock's protected class were treated more favorably than Hancock.

Sleepy's sets out numerous legitimate, non-discriminatory reasons for demoting Hancock and scheduling him primarily at the Aramingo showroom. (Def.'s Mem. Supp. Mot. Summ. J., supra note 1, at 2.) However, if Hancock is able to cast substantial doubt on the validity of his demotion and at least some of his write-ups, then a factfinder may reasonably find that Sleepy's stated reasons for its adverse employment actions are a pretext for a racially discriminatory motive. See Stephens v. Kerrigan, 122 F.3d 171, 182 (3d Cir. 1997); see also Fuentes, 32 F.3d at 764 n.7. Grinnan testified that, when he discussed demoting Hancock with other managers, "[t]he specific issue was around Mr. Hancock's inability to make deposits on time." (Grinnan

Dep. 67:15-16, Oct. 29, 2008.) However, Marchesi stated in his affidavit that Hancock "was demoted due to his consistent inability to follow procedures regarding customer invoices and in making timely bank deposits, and for continued difficulties getting to work on time, and for poor sales performance." (Marchesi Aff. ¶ 12.) Hancock also asserts that "he had been robbed once," "there was a safety and security issue with making deposits in the Aramingo Avenue area, and . . . Grinnan gave him permission to hold on to deposits, if he feared he might be robbed while trying to make the deposit." (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 7.) In addition, with respect to his write-up for violating Sleepy's dress code, Hancock argues that Sleepy's has no policy against the wearing of hoop earrings on the sales floor in front of customers. (Id. at 15.) Finally, regarding his write-up for failing to have customers sign invoices, Hancock denies that the invoices were not signed and asserts that "the portion where the customer would sign" "was not attached to the alleged invoices"; therefore, "Sleepy's could not prove that the invoices had not been signed." (Id. at 8.) Because we find that, in viewing all reasonable inferences in favor of the non-moving party, Hancock has been able to cast substantial doubt on Sleepy's reasons for demoting Hancock and writing him up, his claims of unlawful disparate treatment based on his race will survive summary judgment. See Stephens, 122 F.3d at 182; see also Fuentes, 32 F.3d at 764 n.7.

## 3. Race Discrimination and Hostile Work Environment under Title VII and Section 1981

In addition to his disparate-treatment claims, Hancock alleges that the incidents discussed above created a hostile work environment. To establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish "by the totality

11

of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." Andrews v. City of Phila., 895 F.2d 1469, 1482 (3rd Cir. 1990). Specifically, a plaintiff must show: "(1) the employees suffered intentional discrimination because of their [race]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position; and (5) the existence of respondeat superior liability." Tucker v. Merck & Co., 131 Fed. Appx. 852, 858 (3d Cir. 2005) (quoting Andrews, 895 F.2d at 1482); West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3rd Cir. 1995).

In order to satisfy the first element of the test, a plaintiff must prove that race was a substantial factor in the harassment and that, if he was Caucasian, he would not have been treated in the same manner. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3rd Cir. 1996). Under the second element of the test, the circumstances determining whether harassment is severe or pervasive may include the frequency of the alleged discriminatory conduct, whether it is physically threatening or humiliating and whether it interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). However, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297 (3rd Cir. 1997). Under the third element of the test, the factfinder must determine whether the alleged harassment injured the plaintiff in the case at hand, giving him a cognizable claim for judicial relief. Andrews, 895 F.2d at 1483. Under the fourth element of the test, the Third Circuit has stated that the relevant inquiry is whether the

alleged discrimination would detrimentally affect "a reasonable person of the same protected class in that position." West, 45 F.3d at 753. Finally, the fifth element of the test requires a court to use agency principles. Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 106 (3rd Cir. 1994). An employer is liable if it was aware or should have been aware of the alleged harassment and failed to take action against it. Id.

Hancock asserts that a Caucasian employee would continually racially harass him and Grinnan was on notice of such conduct, but failed to discipline the employee. (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 10.) Grinnan also testified that he never wrote up a salesperson for making racial jokes, although he often observed salespeople engaging in such conduct. (Grinnan Dep. 86:20-87:2, Oct. 29, 2008.) It appears that a jury could reasonably find that race was a substantial factor in the harassment and that, if he was Caucasian, he would not have been treated in the same manner. It also appears that a jury could reasonably find that the alleged discriminatory conduct occurred rather frequently, caused a cognizable injury to Hancock and would detrimentally affect a reasonable person of the same protected class in that position. Thus, viewing all reasonable inferences in favor of the non-moving party, a factfinder could reasonably conclude: (1) Hancock suffered intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected Hancock; (4) the discrimination would detrimentally affect a reasonable African American in that position; and (5) Grinnan was aware or should have been aware of the alleged harassment and he failed to take action against it. Thus, Hancock's claim for a hostile work environment will survive summary judgment.

### 4. Constructive Discharge under Title VII and Section 1981

To succeed on a constructive discharge claim, Hancock must show that Sleepy's "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subjected to them would resign." Aman, 85 F.3d at 1084 (quoting Goss v. Exxon Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)). Using an objective test to determine whether the employee was constructively discharged from employment, the Third Circuit asks whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992). An employee's subjective beliefs are not determinative. Id. at 1083. In essence, to establish a constructive discharge claim, a plaintiff must prove all of the facts required to show a hostile work environment, and must make a further showing that the abusive working environment became so intolerable that his resignation qualified as a fitting response. Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004). An employer may defend against a constructive discharge claim by showing both: (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of racial harassment; and (2) that the plaintiff unreasonably failed to avail himself of that employer-provided preventive or remedial apparatus. Id. at 134. "This affirmative defense will not be available to the employer, however, if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation . . . ." Id.

Here, Hancock has proven the necessary elements of a hostile work environment claim; therefore, we must only determine whether Hancock has made a sufficient showing that the

abusive working environment became so intolerable that his resignation qualified as a fitting response. Viewing all reasonable inferences in favor of the non-moving party, this Court finds that the combination of the alleged racial harassment and the alleged circumstances surrounding Hancock's demotion created an abusive working environment that was intolerable enough to justify Hancock resigning. Moreover, because a factfinder could reasonably conclude that Hancock quit in reasonable response to being demoted, Sleepy's cannot avail itself of the above affirmative defense. Thus, this Court will not grant summary judgment as to Hancock's claim of constructive discharge.

5. **Retaliation under Section 1981**

Hancock claims in Count VIII of the Complaint that Sleepy's retaliated against him in violation of Section 1981. The standard for establishing retaliation under Section 1981 is the same as in Title VII and PHRA claims. See Aguiar v. Morgan Corp., 27 Fed. Appx. 110, 112 (3d Cir. 2002). Thus, we analyze Hancock's retaliation claim under the burden-shifting methodology set forth in McDonnell Douglas. First, to establish a prima facie case of retaliation, a plaintiff needs to show that: 1) he engaged in protected activity; 2) the employer took an adverse employment action after or contemporaneous with the protected activity; and 3) a causal link exists between the protected activity and the employer's adverse action. See, e.g., Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005); Weston v. Commw. of Pa., 251 F.3d 420, 430 (3d Cir. 2001). Next, if a plaintiff successfully establishes a prima facie case, the burden of production of evidence shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. See McDonnell Douglas, 411 U.S. at 802; see also Krouse, 126 F.3d at 500-01; Fuentes, 32 F.3d at 763. Finally, if the defendant meets this requirement, the

burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's articulated reason for the adverse employment action is a pretext for a retaliatory motive. Fuentes, 32 F.3d at 764.

The Third Circuit has stated that "protected activity . . . requires affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others." Montanye v. Wissahickon Sch. Dist., 218 Fed. Appx. 126, 131 (3d Cir. 2007). "In addition to instituting lawsuits, filing affirmative action complaints, and participating in litigation, other examples of protected activity are 'making complaints to management,' 'writing critical letters,' 'protesting against discrimination,' and 'expressing support of co-workers.'" Perry v. Harvey, No. 06-5386, 2008 U.S. Dist. LEXIS 51292, at *24-25 (D.N.J. July 3, 2008) (quoting Montanye, 218 Fed. Appx. at 131); see also Abramson v. William Patterson Coll., 260 F. 3d 265, 288 (3d Cir. 2001) (stating that complaints – whether oral or written, formal or informal – about unlawful employment practice satisfy the first prong of the prima facie case under Title VII).

Hancock alleges that, after working at Sleepy's for approximately five months, he asked Grinnan whether keeping him at the Aramingo showroom was a "black thing." (Pl.'s Mem. Supp. Resp. Def.'s Mot. Summ. J. at 5.) Viewing all reasonable inferences in favor of the non-moving party, a factfinder could reasonably construe this question as an informal complaint, thus satisfying the first element, that the plaintiff engaged in protected activity. The second element is established, as Hancock was demoted and written-up in the months following his questioning of Grinnan. Finally, viewing all reasonable inferences in favor of the non-moving party, a factfinder could find a causal connection between the protected activity and Sleepy's adverse actions. As already discussed, Sleepy's sets out numerous legitimate, non-discriminatory

reasons for demoting Hancock and scheduling him primarily at the Aramingo showroom. (Def.'s Mem. Supp. Mot. Summ. J., supra note 1, at 2.) However, Hancock has been able to cast substantial doubt on the validity of his demotion and at least some of his write-ups, thus allowing a factfinder to reasonably conclude that Sleepy's stated reasons for its adverse employment actions are a pretext for a racially discriminatory motive. See Stephens, 122 F.3d at 182; see also Fuentes, 32 F.3d at 764 n.7. Therefore, Hancock's retaliation claim will also survive summary judgment.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CRAIG HANCOCK, | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 07-5042 |
| SLEEPY'S, LLC, | |
| Defendant. | |

## ORDER

AND NOW, this 10th day of February, 2009, in consideration of the Motion for Summary Judgment filed by Defendant Sleepy's, LLC (Doc. No. 20), and the response and reply thereto, it is hereby **ORDERED** that the Motion is **DENIED**.

BY THE COURT:

/s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE